FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ NOV 16 2026 ★
BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**----------------------------------------------------------X**

**MAUREEN HURLEY,**

**Plaintiff, DOCKET # 24-CV-01664 (NRM) (LKE)**

**-against-**

**THE DEPARTMENT OF EDUCATION**
**OF THE CITY OF NEW YORK,**

**Defendant**

**----------------------------------------------------------X**

# PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(1)(2)(3) AND REQUEST LEAVE TO FILE A SECOND AMENDED COMPLAINT

Maureen Hurley
18 Kisco Park Drive
Mount Kisco, NY 10549
917-517-6379
PRO SE

## PRELIMINARY STATEMENT

*The freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs. See United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944).*

Plaintiff Maureen Hurley respectfully submits this Memorandum of Law in support of her motion pursuant to Federal Rule of Civil Procedure 60(b)(1)(2)(3) seeking relief from the Judgment entered following the Court's October 20, 2026 Memorandum and Order dismissing her Amended Complaint. See Order-JUDGE EXHIBIT 1, attached.

Plaintiff requests that the Judgment be vacated, the case reopened, and she be granted her request to submit a Second Amended Complaint ("SAC") due to: the mistakes, inadvertence and excusable neglect of the Judge; newly discovered evidence that with reasonable diligence could not have been discovered by Plaintiff; new Law governing religious accommodations; fraud, misrepresentation and misconduct by Defendants; applying the Judgment prospectively is no longer equitable; and Plaintiff deserves to get relief from the unjustified deprivation of Constitutional rights deliberately caused by the opposing party and the Judgment cited herein. At all times relevant to this matter, Plaintiff complained about the implementation of the COVID Vaccine Mandate ("CVM") by the New York City Department of Education and other Defendants *as-applied* to her, and not the COVID vaccine itself. Additionally, at no time were the COVID vaccines encased in law, fully approved for general use, or made a condition of employment.

Defendant is, and was in 2021, aware that the COVID Vaccine manufactured by Pfizer was EUA only, and that its' approved version, COMINARTY, was not readily available in New York City. Also, Defendant knew that the vaccine did not prevent the spread of the virus, nor did it prevent

a person from getting the virus. However, the DOE said nothing about any of this AS THEY PROSECUTED Plaintiff and others similarly situated when she asked for a religious exemption accommodation. The DOE policy was, if you are a public worker, get the vaccine or be terminated: "get the jab or lose your job".

The New York State and Federal Court systems bought into the panic-driven policy, but only for a short time, except in cases where the Plaintiff is pro se, and the Court system still remains harsh and punitive. Nonetheless, many cases have won on the failure-to-accommodate in this Court: Chavez v City of New York et al., 23-cv-7754; Hill v Department of Education of the City of New York 24-cv-03506; Lynch v Department of Education of the City of New York, 24-cv-07795, and others.

In 2020, the City created a panic-driven policy that wiped out the preeminence of Constitutional rights to religious freedom, and subsumed this right under an emergency-driven need to terminate public workers in New York City to protect the "alleged" safety of co-workers and in the case presented here, 'vulnerable' children. Schools were closed, businesses punished if they stayed open. Defendant the New York City Department of Education was very aware of the protected class that Plaintiff belonged to, and has fought union protections under the Taylor Law for decades, much to the dismay of the Unions that the City government wants out of the workplace.

A recent case put this war between the City and the Unions in the spotlight as far as the implementation of the COVID Vaccine Mandate (CVM or 2VM) is concerned. When the City put the CVM in place and ordered all City Court employees to get vaccinated or fired, the Unions representing NY Supreme Court employees fought back and won on the right to bargain

the particulars of the implementation policy that terminated them without a due process hearing. (New York City Unified Court System v New York State Public Employment, Index No. 161972/2023 , decided Feb. 10, 2026);

> "PERB rationally found, based on the record before it, that UCS's procedure implementing its decision to require employees to be tested weekly for COVID-19 and, later, to be vaccinated, was not excluded from mandatory bargaining with respondent unions. Even if an employer has the undisputed right to make a particular decision that is "not a subject of mandatory negotiation, the [employer] must negotiate the procedures necessary to effectuate that right" (*Matter of City of Long Beach v New York State Pub. Empl. Relations Bd.*, 39 NY3d 17, 26 [2022]; *Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd*, 95 NY2d 73 [2000]). Here, UCS's undisputed right to require testing and vaccinations was not so "inextricably intertwined" with the procedures that UCS implemented for such testing and vaccination as to make bargaining over the procedures impracticable (*see Matter of Nassau County Police Benevolent Assn. v County of Nassau [Nassau County Police Dept.]*, 27 PERB ¶ 3054 [1994])."

Thus Plaintiff's request presented here has been recently supported by new evidence and law which Judge Morrison overlooked in her rush to Judgment. Another new law relevant to the arguments made here is Bergin v. New York State Unified Court System, No. 25-721 (2d Cir. July 15, 2026), amended (Sept. 15, 2026). In Bergin the Second Circuit Court ruled that an employer's denial of a religious accommodation can constitute an adverse employment action under Title VII, even without additional negative actions taken against the employee. This decision marks a significant shift in how religious accommodations are evaluated in the workplace. "Title VII relaxes" but-for causation "to prohibit even making a protected characteristic a 'motivating factor' in an employment decision."

Plaintiff identifies a discrete legal error that affected the disposition of her religious-accommodation claim: treating Plaintiff's failure to satisfy an arbitral requirement for documentation from a religious official as legally material to whether her personally held religious belief received protection under Title VII.

The distinction is consequential. The Scheinman process could establish procedures governing how DOE processed exemption applications. But compliance with an arbitral documentation requirement and entitlement to protection under Title VII present distinct legal questions. Plaintiff respectfully submits that the Court's dismissal conflated those inquiries and thereby applied an incorrect legal standard to her federal statutory claim.

Any question whether a mistake of law by the deciding court falls within Rule 60(b)(1) was resolved by the Supreme Court in *Kemp*. The Court held that the term "mistake" in Rule 60(b)(1) "includes a judge's errors of law." *Kemp*, 596 U.S. 528. Accordingly, Plaintiff need not characterize the asserted error as clerical, inadvertent, or attributable to a party. The alleged mistake is judicial and legal: the Court applied the absence of documentation from a religious official in evaluating the legal sufficiency of Plaintiff's religious-accommodation claim when controlling law requires examination of Plaintiff's own religious belief and need for accommodation. Rule 60(b)(1) provides the procedural mechanism by which that asserted legal mistake may be corrected.

In *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984), the Second Circuit distinguished examination of sincerity from judicial judgment concerning the truth or validity of an adherent's religious beliefs. The inquiry concerns whether the individual sincerely holds the asserted belief, not whether the belief has been validated by an external religious authority. That distinction became particularly important in *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021), where the Second Circuit considered NYC's COVID-19 religious-exemption process. *Kane* emphasized the constitutional difficulty inherent in governmental evaluation of the centrality or validity of an individual's interpretation of religious doctrine.

More recently, *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319 (2d Cir. 2024), again distinguished a permissible inquiry into whether an applicant sincerely holds a religious belief from an impermissible judgment concerning the character or validity of that religious objection. The significance of that distinction here is straightforward: a personally held religious belief does not become legally deficient merely because it is individualized or because an applicant lacks institutional religious endorsement.

Plaintiff therefore does not ask the Court to eliminate the sincerity inquiry. She asks the Court to apply it to **her belief**, rather than effectively allowing the absence of third-party ecclesiastical documentation to answer that inquiry.

All of the Plaintiff's requests for RA, her wrongful termination, and pleadings on the law are assumed known from the Amended Complaint and her Opposition to Defendants' Motion To Dismiss on the Docket which were submitted in a timely fashion to the Court, (October 24, 2025, Amended Complaint; Motion To Dismiss, March 16, 2026; Plaintiff's Opposition, ECF No. 43; REPLY, ECF No. 44; Exhibits A-I and in the Opposition papers, Exhibits J-S) so they need not be re-argued here. This Court should incorporate all claims and arguments made by Plaintiff in her previously filed papers in this Motion by reference made herein. Exhibits 1-5 are attached here.

Plaintiff requests that this Court relieve her from the Judgment which includes (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence...; (3) fraud..., misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other

reason that justifies relief.'" *Ulanov v. New York State Bd. of Elections*, No. 22-CV-193, 2022 WL 767865, at *1 (E.D.N.Y. Mar. 14, 2022) (quoting Fed. R. Civ. P. 60(b))

In addition to the above, Plaintiff requests that this Court reopen this case so that Plaintiff may file a Second Amended Complaint which includes newly discovered evidence which alters the landscape of constitutional rights denied here, and bring forth the following: (1) the intentional misuse of public office by the City of New York under color of law to sway arbitrators and Judges to deny all religious accommodation requests, in direct violation of Constitutional rights (suggesting a Monell claim, EXHIBIT 2, Steve Banks' email thread); and the Transcripts of Kathleen Rodi in 2025 (EX. 3) for the case of Lorraine Masciarelli; Rodi deposition 2026; (Ex. 4) and deposition of DOC EEO Rep. Bijan Vafegh, Exhibit 5. Together, no information about costs were given, Rodi talked about the reassignment Centers not being used for unvaccinated employees and how she denied all religious exemption accommodations without review, and Bijan Vafegh testified that the appeals process had nothing to do with religious accommodations.

This motion does not merely seek to relitigate issues already decided. Plaintiff identifies a fundamental distinction affecting the judgment that was obscured by treating several legally separate events as though they were one: (1) imposition of the COVID-19 vaccination requirement; (2) Plaintiff's placement on leave without pay ("LWOP"); (3) denial of her requested religious accommodation; and (4) DOE's subsequent permanent termination of her tenured employment on September 6, 2022. The distinction is critical.

Plaintiff therefore respectfully requests that the Court vacate or modify the judgment under Rule 60(b)(1)(2)(3); reconsider the dismissal in light of the distinction between LWOP and

termination, and permit Plaintiff's claims concerning her permanent termination, deprivation of tenure, due process, religious accommodation, and related constitutional injuries to proceed.

**STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY**

Plaintiff was hired by DOE in 2001 and subsequently obtained tenure. In 2021, DOE became subject to the vaccination requirement applicable to DOE personnel. Following collective bargaining proceedings between DOE and the United Federation of Teachers, Arbitrator Martin Scheinman issued an Impact Award governing implementation of the mandate for those employees who applied for medical or religious accommodations/exemptions.The Award provided that certain employees who remained unvaccinated could be placed on LWOP.

Plaintiff requested a religious exemption based upon her sincerely held religious beliefs. Her request was denied. She appealed the determination but remained unsuccessful. She was placed on LWOP. (AC, pp. 5-9). Critically, however, the employment action did not end there.

On September 6, 2022, DOE terminated Plaintiff's employment. Thus, this was no longer merely a case involving temporary LWOP while Plaintiff remained unable to satisfy a condition for active service due to some unknown "undue burden", not incompetency. DOE had permanently severed Plaintiff's tenured employment relationship. On Dec. 7, 2023, Plaintiff received an EEOC Right To Sue letter.(AC, Ex. A). Plaintiff timely filed this action asserting, among other claims, violations of Title VII, 42 U.S.C. § 1983, the First and Fourteenth Amendments, and state and city human-rights laws. She filed her Amended Complaint Oct. 24, 2025. The Court ultimately dismissed the Amended Complaint on October 20, 2026. Plaintiff now moves for relief from that judgment.

## ARGUMENT

### I. RULE 60(b)(1) AUTHORIZES RELIEF BECAUSE THE JUDGMENT RESTS UPON A MATERIAL LEGAL MISTAKE CONCERNING THE DISTINCTION BETWEEN LWOP AND PERMANENT TERMINATION

Federal Rule of Civil Procedure 60(b)(1) permits a court, "on motion and just terms," to relieve a party from a final judgment because of "mistake, inadvertence, surprise, or excusable neglect."

The Supreme Court has held that "mistake" under Rule 60(b)(1) encompasses a judge's errors of law. *Kemp v. United States*, 596 U.S. 528, 533–35 (2022). Rule 60(b)(1) thus provides the appropriate mechanism where a material legal error in the judgment itself warrants correction.

The Scheinman Impact Award (EXHIBIT B,AC) authorized DOE, under specified circumstances, to place unvaccinated employees on LWOP. It expressly characterized such placement as non-disciplinary, so that no 3020-a arbitration would be scheduled. Yet a problem code for misconduct was placed into the file of Plaintiff and all other DOE employees who did not hand in a vaccination card on October 4, 2021. (AC, EX. G) Martin Scheinman assisted in creating the §3020-a procedure for the DOE and UFT, and knew very well that he was pursuing unlawful procedure in direct violation of the protections cited in the Taylor Law. The New York Court of Appeals' decision in *Matter of O'Reilly v. Board of Education* likewise addressed whether employees were entitled to Education Law §§ 3020 and 3020-a proceedings before being placed on LWOP for failing to satisfy the vaccination condition (that was never in the UFT Contract, nor made into law).

Plaintiff's federal claim, however, concerns something materially different: DOE denied Plaintiff's request for accommodation and ultimately terminated her tenured employment

without bargaining with the teacher's Union, the United Federation of Teachers. This was again violation of the Taylor Law. See New York State Unified Court System v New York State Public Employment relations Board, 2026 NY Slip Op 006221, Index No. 161972/23 Appeal No. 5789, Case No. 2024-04036:

"UCS's procedure implementing its decision to require employees to be tested weekly for COVID-19 and, later, to be vaccinated, was not excluded from mandatory bargaining with respondent unions. Even if an employer has the undisputed right to make a particular decision that is "not a subject of mandatory negotiation, the [employer] must negotiate the procedures necessary to effectuate that right" (*Matter of City of Long Beach v New York State Pub. Empl. Relations Bd.*, 39 NY3d 17, 26 [2022]; *Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd*, 95 NY2d 73 [2000]).

In Plaintiff's case the DOE implemented a policy that violated not only the UFT contract, but Federal Law and EEOC Guidelines. No information about the DOE's "undue hardship/burden" or a change in the UFT contract altering the conditions of employment have ever been seen or described in the detail needed for Title VII.

The dispositive question therefore was not simply whether vaccination constituted a lawful condition of employment or whether DOE could temporarily place Plaintiff on LWOP while that condition remained unsatisfied. The question was whether those authorities also supplied DOE with lawful authority to permanently extinguish Hurley's tenured employment without the procedures attendant to termination of tenure. They did not.

This distinction becomes particularly important because DOE simultaneously placed a "Problem Code" or comparable no-hire designation on Plaintiff's employment record, which Plaintiff alleged carried misconduct-type consequences and impaired her ability to obtain further DOE employment or apply for Unemployment Benefits. See EXHIBIT G and I, AC.

Plaintiff's Title VII claim supplies an additional basis for reconsideration. In Bergin, amended Sept. 15, 2026, the Second Circuit held that EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015), abrogated the Circuit's former three-part prima facie test for religious failure-to-accommodate claims. The former rule asked whether the employee held a bona fide religious belief conflicting with an employment requirement, informed the employer, and was disciplined for noncompliance. Bergin held that this formulation is no longer good law because it imposed an employer-knowledge requirement but did not expressly require consideration of motive.

After Bergin, a plaintiff must demonstrate: (1) that she actually required an accommodation of her religious practice; and (2) that the employer's desire to avoid the actually required prospective accommodation was a motivating factor in (3) an adverse employment decision. No. 25-721, slip op. at 2, 15–24. This does not impose a heightened requirement to prove hostility toward religion. The question is whether avoiding the required accommodation was a motivating factor in the adverse decision. Plaintiff says yes.

Thus the Morrison judgment failed to distinguish adequately between two legally and factually separate employment actions: (1) DOE's placement of Plaintiff on leave without pay ("LWOP"); and (2) DOE's subsequent permanent termination of Plaintiff's tenured employment on September 6, 2022. The authorities supporting the first action do not automatically establish the legality of the second.

Plaintiff therefore respectfully submits that the dispositive question requiring reconsideration is:

What lawful authority and procedure permitted DOE to move Plaintiff from non-disciplinary LWOP to permanent separation from her tenured employment on September 6, 2022?

## II. THE COURT'S "CONDITION OF EMPLOYMENT" ANALYSIS DOES NOT ANSWER THE DISPOSITIVE QUESTION: BY WHAT LAWFUL MECHANISM DID PLAINTIFF'S TENURE CEASE TO EXIST?

Plaintiff was not a probationary employee terminable at will. She had acquired tenure. Even accepting arguendo the conclusion that vaccination constituted a lawful condition for active employment, that proposition does not independently establish that Plaintiff's failure to satisfy the condition automatically extinguished her previously acquired tenure. Three propositions must remain analytically separate:

Vaccination constituted a condition applicable to DOE personnel; Plaintiff did not satisfy that condition and consequently could be restricted from active service; and DOE possessed lawful authority permanently to extinguish Plaintiff's tenured employment.

The first and second propositions do not themselves establish the third. There is a fundamental difference between saying: "You presently cannot perform active service because you do not satisfy this employment condition," and saying: "Your previously acquired tenure and employment relationship have permanently ceased to exist." That is the line the judgment failed adequately to draw.

## III. EDUCATION LAW § 3020 MAKES THE NATURE OF PLAINTIFF'S TENURE INTEREST MATERIAL TO THE TERMINATION ANALYSIS

New York's statutory tenure regime supplies the underlying source of the employment interest Plaintiff alleges DOE deprived her of. Education Law § 3020 protects persons enjoying the benefits of tenure against discipline or removal except for just cause and through the procedures prescribed by § 3020-a or an applicable qualifying alternative procedure.(Ex. H, AC)

Education Law § 3020-a, in turn, establishes procedures governing charges against persons enjoying the benefits of tenure. Plaintiff does not contend that § 3020-a necessarily governs

every conceivable non-disciplinary termination of every tenured employee. Rather, Plaintiff makes the narrower point that once the pleading established both tenure and subsequent permanent termination, the Court was required to identify the legal mechanism by which DOE lawfully extinguished that tenure. The answer cannot simply be "condition of employment."

That describes the vaccination requirement. It does not, without further analysis, identify the legal mechanism through which Plaintiff's tenure ceased to exist. LWOP and termination were different employment actions under the Scheinman framework itself. The Scheinman Impact Award authorized DOE to place specified employees on LWOP. Critically, the Award expressly provided: "Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose."The framework therefore treated LWOP as a specific employment status rather than as permanent termination.

Employees on LWOP retained specified incidents of the employment relationship. The framework contemplated continued eligibility for health insurance and, for employees satisfying specified requirements within the applicable period, a right of return to the same school. Most importantly for present purposes, the Award separately addressed the possibility of subsequent separation. For employees who remained on LWOP, the Award provided separation options and further contemplated that, under the specified circumstances, DOE subsequently would "seek to unilaterally separate" employees who had not selected one of the available options.

That sequence demonstrates an elementary but critical proposition: LWOP was not itself permanent separation. If placement on LWOP had already terminated the employment relationship, there would have been no employment relationship from which DOE subsequently

needed to "separate" the employee. Likewise, there would have been no reason for the Award to address a subsequent right of return or to provide separately for later separation.

## IV. O'REILLY ITSELF DISTINGUISHES PLACEMENT ON LWOP FROM SUBSEQUENT SEPARATION

The New York Court of Appeals' decision in *Matter of O'Reilly v. Board of Education of the City School District of the City of New York* reinforces this distinction. The petitioners in *O'Reilly* were tenured teachers challenging their placement on leave without pay following failure to submit proof of vaccination. The Court of Appeals framed its holding accordingly: those petitioners were not entitled to Education Law §§ 3020 and 3020-a proceedings before being placed on LWOP because the employment action at issue involved enforcement of a condition of employment rather than teacher discipline relating to misconduct, competency, or job performance. That holding is material to Plaintiff's LWOP. It does not eliminate the need to analyze her later termination. Indeed, *O'Reilly* itself recounts the Impact Award's sequence: first, qualifying employees could be placed on LWOP; while on LWOP certain employment-related rights remained; and subsequently, employees who remained within the relevant category could face specified separation options or DOE's effort to unilaterally separate them. The Court should therefore treat these as the separate employment actions the governing framework itself made them.

Plaintiff expressly recognizes an important qualification. *O'Reilly* relied upon *Matter of Beck-Nichols v. Bianco*, 20 N.Y.3d 540 (2013), in discussing circumstances in which a teacher's failure to satisfy a requirement defining eligibility for employment may result in termination outside the ordinary disciplinary framework of Education Law §§ 3020 and 3020-a. Plaintiff therefore does **not** ask this Court to hold that every separation of a tenured teacher necessarily

requires a § 3020-a disciplinary hearing. Yet even if New York law recognizes a non-disciplinary pathway by which a tenured employee can be terminated for failing to satisfy an employment-eligibility requirement, (Plaintiff does not agree that this is true in all cases) DOE must still identify the lawful pathway that governed Hurley's particular September 6, 2022 termination and demonstrate that its prerequisites applied to her. Thus, *Beck-Nichols* does not eliminate the termination inquiry. It makes identification of the precise legal basis for that termination essential.

## V. THE LANGUAGE "SHALL SEEK TO UNILATERALLY SEPARATE" UNDERMINES ANY THEORY THAT LWOP ITSELF AUTOMATICALLY TERMINATED PLAINTIFF

The language of the Impact Award is particularly important. The Award did not describe placement on LWOP as itself constituting permanent separation, and opened the door to applications for exemption accommodation. Plaintiff stands on the fact that vaccine exemption requests and requests for an accommodation are the same in the relief provided.

Instead, the Award contemplated that DOE later "shall seek to unilaterally separate" certain employees after and at the point that appeals were over. This never happened. Plaintiff was removed from salary before her appeals finished. Accordingly, the relevant chronology is not:

**Failure to vaccinate → automatic termination,** but is

**Failure to satisfy vaccine condition → LWOP → subsequent separation process → termination.** That middle step cannot simply be omitted from the constitutional analysis.

At minimum, the Court must determine whether Plaintiff's September 6, 2022 termination was in fact accomplished through the unilateral-separation mechanism contemplated by the Award, or through some other authority.

## VI. THE COURT SHOULD REQUIRE DOE TO IDENTIFY THE PRECISE LEGAL AUTHORITY FOR HURLEY'S SEPTEMBER 6, 2022 TERMINATION

This provides a straightforward framework for reconsideration. The question is not whether the vaccination mandate was lawful in the abstract. The question is: What provision of law, arbitration award, collective bargaining agreement, or other lawful authority actually terminated Hurley's tenure on September 6, 2022? If DOE relies upon §§ 3020 and 3020-a, the Court should identify the applicable procedure. If DOE relies upon an alternative collectively bargained procedure, it should identify that procedure and establish its applicability.

If DOE relies upon the Scheinman Award's unilateral-separation provision, the Court should determine whether Hurley's termination occurred pursuant to that provision and whether its prerequisites were satisfied. If DOE relies upon *Beck-Nichols* and characterizes termination as enforcement of an eligibility requirement, the Court should determine whether Hurley's particular circumstances fall within that rule. If DOE relies upon some other non-disciplinary mechanism, the Court should identify both the authority and the process governing it. But the legality of permanent termination cannot be established merely by proving that the preceding LWOP was lawful.

## VII. SECOND CIRCUIT PRECEDENT REQUIRES CONSIDERATION OF THE PARTICULAR DEPRIVATION AND THE PROCESS ACCOMPANYING IT

The Second Circuit's decision in *Strong v. Board of Education of Uniondale Union Free School District*, 902 F.2d 208 (2d Cir. 1990), is instructive. *Strong* involved a tenured New York public-

school teacher whom the district would not permit to return from an extended medical absence until she provided medical records and underwent a physical examination. The Second Circuit did not end its constitutional analysis merely because the school district possessed authority to impose employment-related medical requirements. It examined the adverse governmental action and the process provided in connection with that action, concluding on the particular facts before it that procedural due process was satisfied by the notice, opportunity to respond, and available state mechanism for judicial review. *Id.* at 211–12.

The analytical structure is important here. DOE's authority to establish an employment condition is one question. Whether constitutionally adequate procedures accompanied the permanent deprivation of Plaintiff's tenure is another. The distinction from *Strong* makes the point even clearer. *Strong* concerned a tenured teacher's ability to return to active employment after leave. Hurley alleges something more consequential: DOE eventually terminated the underlying employment relationship altogether.

Thus, the appropriate due-process question is "What process accompanied DOE's subsequent permanent deprivation of Hurley's underlying tenure interest?" The Court must identify the deprivation being challenged.

## VIII. HURLEY'S TENURE CONSTITUTED A PROPERTY INTEREST REQUIRING A DISTINCT DUE-PROCESS ANALYSIS

Public employment constitutes protected property when applicable law creates a legitimate entitlement to continued employment. See *Board of Regents v. Roth*, 408 U.S. 564, 576–78 (1972). Once that property interest exists, the government cannot deprive its holder of it without

constitutionally sufficient process. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538–42 (1985).

The Second Circuit has applied procedural-due-process principles directly to tenured New York public-school employment. *Strong*, 902 F.2d at 211–12. Thus, even assuming Plaintiff temporarily became ineligible to perform active service, the Court still had to determine whether and by what legal means that circumstance extinguished her underlying tenure. The two concepts are not interchangeable. Eligibility to work actively at a particular moment is not necessarily identical to ownership of an underlying tenured employment interest. That distinction should control reconsideration.

## IX. THE PROBLEM CODE ALLEGATIONS FURTHER DISTINGUISH PLAINTIFF'S CLAIM FROM A SIMPLE EMPLOYMENT-ELIGIBILITY CASE

Plaintiff further alleged that DOE placed a "no-hire/inquiry/Problem Code" designation on her employment record. (See EX. G, AC). According to the Amended Complaint, that designation burdened her ability to obtain DOE employment and marked her record in a manner associated with misconduct-type consequences, such as getting denied for Unemployment Benefits. See Ex. I, AC. This allegation reinforces why Plaintiff's case should not be reduced to temporary enforcement of a neutral eligibility condition. Plaintiff alleges a cumulative sequence:

1. she invoked a religious objection;
2. DOE denied her requested accommodation;
3. DOE excluded her from active service;
4. DOE placed her on LWOP;
5. DOE placed a Problem Code or no-hire designation on her employment record; and

6. DOE ultimately permanently terminated her tenured employment.

The legal consequences of that complete sequence cannot necessarily be resolved through an authority deciding only whether an employee could lawfully be placed on LWOP.

## X. THE COURT'S CONCLUSION THAT PLAINTIFF WAS "UNQUALIFIED" UNDER AN EMPLOYMENT-DISCRIMINATION ANALYSIS DOES NOT ITSELF EXTINGUISH HER FOURTEENTH AMENDMENT PROPERTY INTEREST

There is an additional analytical distinction. Whether Plaintiff was "qualified" for purposes of a Title VII discrimination claim is not identical to whether she possessed a Fourteenth Amendment property interest in continued tenured employment. Those inquiries arise from different bodies of law. Hurley's claimed tenure interest arose from New York law.

Relevant here is the ruling in the U.S. Supreme Court, Burlington Northern and Santa Fe Railway v White, 548 US 53 (2006): "The Supreme Court unanimously agreed that White suffered retaliatory discrimination when she was reassigned to less desirable duties and suspended without pay for 37 days. Though the duties were within the same classification and the pay was eventually reinstated, the action was nevertheless sufficiently harsh to constitute retaliatory discrimination."

What is clear is that Judge Morrison made an error when she wrote in her dismissal that Plaintiff became suddenly unqualified for her job when she did not get vaccinated. There is no rule, memorandum of law, statute or contractual clause that would make this statement true.

The Due Process Clause protects an existing property entitlement from governmental deprivation without constitutionally adequate process. Consequently, even if Plaintiff could not satisfy a qualification element of a particular discrimination theory because she did not meet the

vaccination condition, that conclusion does not independently establish that her tenure ceased to exist.

A Title VII qualification analysis cannot substitute for the constitutionally distinct property-interest inquiry. Also, and more importantly, what exactly is the condition of employment that forced Plaintiff into getting fired? Her contract was never changed, in the 20+ years she taught for the DOE. Kathleen Rodi, in her deposition on October 16, 2026, when asked if the mandate that employees must be vaccinated appeared in the UFT contract, testified "No, it does not". (Ex. 4, Rodi Deposition Oct. 16, 2026, pp. 88-89).

When Ms. Rodi was asked, "When did being – being vaccinated become a condition of employment?", her answer was, "In 2021."(p. 123). Then she was asked if the contract was changed (because there is not mention of getting vaccinated at any time), and Rodi's answer was, ".. not all conditions of employment are in a contract." (p. 123). She was clearly wrong and knew that she was not giving a truthful answer. Then, Rodi admitted that after checking to see whether the page was filled out for either medical or religious exemption, the request was denied because of "undue burden". She never explained what the burden was. (p. 123-124)

## XI. BERGIN REQUIRES RECONSIDERATION OF THE RELIGIOUS-ACCOMMODATION CLAIM UNDER THE SECOND CIRCUIT'S GOVERNING MOTIVE-BASED STANDARD

Plaintiff's Title VII claim supplies an additional basis for reconsideration. In Bergin v. New York State Unified Court System, No. 25-721 (2d Cir. July 15, 2026), amended (Sept. 15, 2026), the Second Circuit held that EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015), abrogated the Circuit's former three-part prima facie test for religious failure-to-accommodate claims.

The former rule asked whether the employee held a bona fide religious belief conflicting with an employment requirement, informed the employer, and was disciplined for noncompliance. Bergin held that this formulation is no longer good law because it imposed an employer-knowledge requirement but did not expressly require consideration of motive.

After Bergin, a plaintiff must demonstrate: (1) that she actually required an accommodation of her religious practice; and (2) that the employer's desire to avoid the actually required prospective accommodation was a motivating factor in (3) an adverse employment decision. No. 25-721, slip op. at 2, 15–24. This does not impose a heightened requirement to prove hostility toward religion. The question is whether avoiding the required accommodation was a motivating factor in the adverse decision. Here, it clearly was (Ex. 2, 3, Rodi Depositions; Ex. 4 MEMO; EX. 5 Bijan Vafegh, EEO for the Department of Corrections, and on the Citywide Panel; Transcript ("THE WITNESS: ...I don't see the -- the determination being based on religious beliefs." **P. 26**,..If I had reason to believe that the religious beliefs were insincere, I might put it in a letter...It's kind of a hard thing to make that determination though.....p. 27. Vafegh's motive was to declare undue hardship for all requests for religious accommodations. Religious beliefs were not part of the decision-making.

Recently released information proves the unconstitutional processes used by the Defendants to deny all Department of Education employees who appealed their religious exemptions/accommodations denials: Steven Banks' email thread reveals the City wanted the arbitrators and Judges to be swayed against granting any religious accommodation requests (Ex. 4); in the Deposition of Katherine G. Rodi by Attorney Austin Graff, posted on the docket in the case of Lorraine Masciarelli in this Court (24-CV-7553-CBA-VMS, Docket #76, filed 5/14/25) p. 22 Graff asked Ms. Rodi:

"Q. So regardless of what religious belief the person had, it was going to be denied no matter what?

A. Yes."

This same disregard for any of the appeals submitted to Defendants can be seen on pp. 25-27, 29, 40, 43, 53.

In her 2025 Deposition (Ex.3) Rodi testified that she was Director of the "General Committee", created within HR at the NYC DOE, that received all the religious requests for accommodation from DOE employees, and denied everyone without review.

The Citywide Panel was an appeal panel that used the word "undue burden" (sometimes they used "did not meet the criteria") but nonetheless had the intent to deny almost everyone who submitted their exemption/accommodation.

The word "undue burden" was used as a pretext to cover up the Defendants' religious discrimination and retaliation that powered all the actions of Defendants cited by the Plaintiff in her Complaint. Title VII treats hiring and discharge alike, and termination is a cognizable adverse employment action. That holding is directly relevant because Plaintiff alleged that she required a religious accommodation, DOE knew of and denied her request, placed her on LWOP, and ultimately terminated her employment. The motive was to remove tenure from public employment in NYC.

The dismissal therefore cannot rest solely on the conclusion that vaccination was a general condition of employment or that Plaintiff became "unqualified" when she remained unvaccinated. That reasoning bypasses Bergin's required inquiry: whether DOE's desire to avoid providing the accommodation Plaintiff actually required was a motivating factor in the denial,

LWOP, or termination. At minimum, Plaintiff should be permitted to amend to plead that theory expressly.

## XII. GROFF REQUIRES A PARTICULARIZED UNDUE-HARDSHIP ANALYSIS

Bergin governs the prima facie case; Groff v. DeJoy, 600 U.S. 447 (2023), governs the employer's undue-hardship defense. Groff rejected the view that any burden "more than de minimis" establishes undue hardship. The employer must show that granting the accommodation would result in substantial increased costs in relation to the conduct of its particular business. Id. at 468–72. The DOE has never given anyone this information.

That inquiry is context-specific and must address the accommodation actually requested, the employer's operations, and the practical burden of providing it. The general existence of the vaccination requirement, standing alone, does not establish undue hardship. If DOE invokes that defense, the Court must require the particularized showing Groff demands. The DOE has never given any costs associated with the undue burden, and this is a requirement that needs analysis in a Second Amended Complaint.

The word "undue burden" was used as a pretext to cover up the Defendants' religious discrimination and retaliation that powered all the actions of Defendants cited by the Plaintiff in her Complaint. Methods of proving that an employer's reason for taking an adverse employment action is false include:

- A significant contradiction between yearly performance evaluations, and the proffered non-discriminatory reasons. *Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991), cert. denied, 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992) ("If at the time of the adverse employment decision the decision-maker gave one reason, but at the time of the trial gave a different reason which was unsupported by the documentary

evidence the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification."

- An absence of contemporaneous evidence of the alleged basis for the adverse action. For example, the Seventh Circuit noted in *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634-35 (7th Cir. 1996): "The jury apparently concluded from the total absence earlier of the justification Coca-Cola would later offer at trial that the justification had been concocted in preparation for trial to fit the available facts. In other words that it was pretextual."
- Inconsistent or changing explanations for the adverse action. For example, in Jolly v. Northern Telecom Inc., 766 F. Supp. 480, 493-94 (E.D.Va. 1991) , the court held: "Although the defendant then offered a multiplicity of reasons to justify its action, the plaintiff had little trouble proving that none of these explanations was worthy of any credence. To be sure, Jolly did not have too onerous a task, as the defendant's various personnel told so many stories, so totally inconsistent with each other, that they had lost all credibility by the conclusion of the proceedings. Put simply, NTI took more positions than a gymnast on a trampoline." Additional case authorities about shifting explanations include:
  - *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001)("A factfinder could infer from the late appearance of Sears's current justification that it is a post-hoc rationale, not a legitimate explanation of Sears's decision not to hire" plaintiff.)
  - Domiguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) (A company may have several legitimate reasons to dismiss an employee. But when

a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual.")

- *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.")

- The falsity of the explanation can give rise to an inference that the employer is dissembling to cover up an ulterior purpose. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000); *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may … suffice to show intentional discrimination."); *Stratton v. Dep't for the Aging for New York*, 132 F.3d 869, 880-81 (2d Cir. 1997) (holding that evidence of an employer's false explanation for employment action supported the jury's finding of unlawful pretext). In the criminal context, courts frequently refer to false exculpatory statements as evidence of consciousness of guilt. *See, e.g., United States v. Reyes*, 302 F.3d 48, 56 (2d Cir.2002) ("[I]t is reasonable to infer guilty knowledge from [the defendant's] false exculpatory statement."). These inferences are "consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves*, 530 U.S. at 147 (internal quotation marks omitted).

Thus Plaintiff, the Court of Appeals, Katherine Rodi's testimony, and Vafegh's testimony all support Plaintiff's argument here that she was applying for a religious accommodation not just an exemption, that the terms were used interchangeably, and no one was hearing her or

reviewing her requests. Plaintiff once again asks this Court for an opportunity to address this in a Second Amended Complaint.

In the Transcript of Katherine G. Rodi cited above EX. 4, Ms. Rodi testified that no masking or testing was allowed if the employee was unvaccinated. It was a well-known fact that the NYC DOE refused the masking and testing route. If you were not vaccinated, you could not be in a school building. Period. However, several hundred NYC DOE employees were granted exemptions/accommodations, and given a place to sit *on salary* while the CVM was in place. See

**New Rubber Rooms Pop Up Throughout NYC To Warehouse Unvaccinated Employees Who have Won medical or Religious Exemptions**
**https://nycrubberroomreporter.blogspot.com/2022/03/new-rubber-rooms-pop-up-throughout-nyc.html**

In her Amended Complaint, Plaintiff made clear that her request for a religious **exemption** to Scheinman's arbitration panel was her accommodation request. She wrote that she wanted a religious **accommodation** or "RA".

The Judgment made a reversible error in agreeing with the Defendant in denying Plaintiff's request for a religious exemption/accommodation on the basis of "undue hardship" without any particulars required by a recent decision in Groff v DeJoy, No. 22-174 (Jan. 13, 2023). If a plaintiff satisfies her burden to allege a prima facie case of religious discrimination, as Plaintiff did in this case, the burden shifts to the employer "to show that it cannot reasonably accommodate the plaintiff without undue hardship on the conduct of the employer's business." *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd and remanded*, 479 U.S. 60 (1986). An accommodation is an undue burden when it is "substantial in the overall context of an employer's business." *Groff v. DeJoy,* 600 U.S. 447, 468 (2023). This, too, is a "fact-specific inquiry," which requires the Court to analyze "all relevant factors in the case at

hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* at 468, 470-71.

The Order made a reversible error in not giving the Defendant the burden of proof for declaring "more than a minimal hardship" as the final decision of the Citywide Panel in support of denying Plaintiff her religious exemption/accommodation request. The Defendant did not prove what an "undue burden" in dollars, was. This was an intentional denial of due process under Title VII and Groff v DeJoy

## XIII. THE COURT SHOULD CONSIDER THE COMPLETE SEQUENCE OF DEPRIVATIONS RATHER THAN TREAT THE "CONDITION OF EMPLOYMENT" LABEL AS DISPOSITIVE OF EACH EVENT

The allegations must ultimately be viewed cumulatively. Plaintiff did not simply refuse a workplace directive and immediately cease to be an employee. The lawfulness of one step does not automatically validate every subsequent step, and she has insisted at all times that she is complaining about the as-applied CVM, not the Mandate itself. Process is the keyword.

Most importantly, the Award and *O'Reilly* themselves distinguish LWOP from later separation.

## XIV. PLAINTIFF'S PRO SE PLEADING WAS REQUIRED TO BE CONSTRUED TO RAISE THE STRONGEST CLAIMS ITS FACTS SUGGESTED

Plaintiff litigated this action pro se. A pro se pleading must be liberally construed and held to less stringent standards than pleadings prepared by attorneys. *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010); *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004); Ruotolo v. I.R.S., 28 F.3d 6, 8 (2d Cir. 1994). The Second Circuit likewise requires courts to construe pro se submissions liberally and interpret them to raise the strongest arguments they suggest.

## XV. AT MINIMUM, THE JUDGMENT SHOULD BE VACATED TO PERMIT THE TERMINATION CLAIM TO BE PLEADED WITH GREATER PARTICULARITY

If the Court concludes that the existing Amended Complaint did not adequately plead the legal issues presented here for relief for judgment, Plaintiff alternatively requests relief permitting that deficiency to be cured. At minimum, the new information of the email thread of Steven Banks, and the careless disregard for constitutional rights shown by Bijan Vafegh and Kathleen Rodi in their depositions, call for a Second Amended Complaint to clearly define what happened in this case.

Because final judgment has been entered, Plaintiff recognizes that Rule 15 does not independently permit amendment without first satisfying the requirements for reopening the judgment under Rule 60. Plaintiff therefore does not contend that Rule 15's liberal amendment standard supersedes Rule 60.

Rather, Plaintiff requests that the judgment first be vacated under Rule 60(b)(1)(2)(3) because the dismissal failed to distinguish adequately between lawful placement on LWOP and the subsequent permanent termination, new information has altered Title VII review, and defendants' misrepresentation of Plaintiff being subjectively incompetent must be clarified..

The further amended pleading would specifically identify:

1. Plaintiff's tenure status immediately before LWOP;
2. the non-disciplinary character of the LWOP authorized by the Impact Award;
3. the employment-related rights Plaintiff retained while on LWOP;
4. the particular separation mechanism contained in the Impact Award;
5. the circumstances of DOE's September 6, 2022 termination of Plaintiff;

6. whether DOE relied upon the unilateral-separation provision or another authority;
7. the process afforded before permanent separation;
8. the Problem Code/no-hire designation and its alleged consequences; and
9. DOE's treatment of Plaintiff's religious-accommodation request.

That amendment would not merely repeat allegations previously rejected. It would expressly plead the legal and factual distinction central to this Rule 60(b) motion.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion pursuant to Federal Rule of Civil Procedure 60(b)(1)(2)(3), vacate or modify the judgment entered following the October 20, 2026 Memorandum and Order to the extent necessary to reconsider Plaintiff's claims arising from the permanent termination of her tenured employment, and reinstate those claims for further proceedings.

Plaintiff further requests reconsideration of her religious-accommodation and related constitutional claims to the extent their dismissal depended upon treating Plaintiff's failure to satisfy the general vaccination requirement as dispositive of the separate accommodation inquiry.

Alternatively, Plaintiff respectfully requests that the Court vacate the judgment to the extent necessary to permit Plaintiff, proceeding pro se, to file a second amended complaint specifically pleading the legal and factual distinction between her non-disciplinary LWOP and DOE's subsequent permanent termination of her tenured employment with a problem code.

Plaintiff respectfully requests such other and further relief as the Court deems just and proper.

Dated: Mt. Kisco, New York

November 16, 2026

Respectfully submitted,

**/s/Maureen Hurley**

Plaintiff Pro Se